**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 21-cv-2478

**REBECCA AGWU,**
**JESSE ANDERSEN,**
**AZRIA ARROYO,**
**SCARLETT BARNHILL,**
**DANA BERGREN,**
**CHELSEA SMITH,**
**VICTORIA BROWN,**
**PORSHAI CAMPBELL,**
**DAVID CHAPMAN,**
**THERESA DOUGHERTY,**
**DAVID HAGAN,**
**FORREST ELLIOT,**
**FERNANDO GARCIA,**
**ALISA GUY,**
**BRANDI SMITH,**
**JARED HAYES,**
**EMILY HEYDT,**
**PAMELA KELTIE,**
**JAMES STACEY,**
**CHRISTOPHER LO COCO,**
**LUNA ROSE LO COCO,**
**TIMMY LOMAS,**
**ALEXIS MENDEZ,**
**ALEXIS MORRIS-PHILIPPUS,**
**CARTER NADOLSKY,**
**BRANDEN RICH,**
**ELLEKTRA ROWLAND,**
**ELIZABETH WERREN,**
**BENJAMIN BIALY,**
**ASA BRIGGS,**
**JOHN CAMERON,**
**DAN DELANY,**
**AILYN HAVENS,**
**LILY KNOWLES,**
**K.M., a minor child, by and through her parents, Bradley and Desiree Mashino,**
**RYAN JON PFLANZER,**
**DAVID SEAVER,**
**SABLE SPOTTSWOOD,**
**JONATHAN ZIEGLER,**

1

**JAMES SWEETMAN,**
**NICHOLAS TITUS, and**
**GREGORY TRICKEL,**

      Plaintiffs,

v.

**THE CITY AND COUNTY OF DENVER, a Colorado municipal corporation,**
**OFFICER DAVID HUNTER, in his individual capacity,**
**OFFICER ALFONSO CARRERA, in his individual capacity, and**
**DOES 1-100, in their individual capacities and whose true names are unknown,**

      Defendants.

---

## AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiffs, listed above, by and through their counsel of record, BEEM & ISLEY, P.C., and BAUMGARTNER LAW, LLC, respectfully submit this Amended Complaint against the Defendants, and allege and aver as follows:

### JURISDICTION AND VENUE

1.    This action is brought pursuant to 42 U.S.C. §1983 and §1988, and the First, Fourth and Fourteenth Amendments to the United States Constitution.  Jurisdiction is founded upon 28 U.S.C. §1331, §1343(a)(3) and (4), and the aforementioned statutory and constitutional provisions.

2.    Venue is proper in the United States District Court for the District of Colorado pursuant to 28 USC §1391(b) because the Defendants are citizens and residents of Colorado, and the events, acts and/or omissions giving rise to this action occurred in Colorado.

**PARTIES**

3.      The Plaintiffs, identified individually in greater detail below, are current or former citizens of or visitors to the State of Colorado who were present, nearby, observing, participating in, and/or otherwise associated with peaceful protests in Denver, Colorado, on various dates starting from May 28, 2020, and going into the month of July 2020.

4.      Defendant, The City and County of Denver (the "City"), is and was at all relevant times a Colorado municipal corporation with final policy-making authority over the Denver Police Department ("DPD") and its police officers.

5.      At all relevant times, the City was responsible for supervising, enacting, and enforcing the DPD's conduct, policies, and practices; the absence of necessary policies and practices; and for the hiring, retention, supervision, and training of employees and agents of the DPD.  The City was also responsible for the actions of officers from other law enforcement agencies from whom the City requested assistance.

6.      Defendant Officer David Hunter ("Defendant Hunter" or "Officer Hunter") was at all relevant times an officer, employee, and/or agent of the DPD who was acting under color of state law and within the course and scope of his agency or employment with and/or the authorization of the DPD, and who violated the clearly established constitutional rights of certain Plaintiffs as alleged more fully below.

7.      Defendant Officer Alfonso Carrera ("Defendant Carrera" or "Officer Carrera") was at all relevant times an officer, employee, and/or agent of the DPD who was acting under color of state law and within the course and scope of his agency or employment with and/or the

authorization of the DPD, and who violated the clearly established constitutional rights of certain Plaintiffs as alleged more fully below.

8.      Defendants, Does 1 through 100, are and were at all relevant times officers, employees, and/or agents of the DPD or officers of other agencies or jurisdictions who were acting under color of state law and within the course and scope of their agency or employment with and/or the authorization of the DPD, and who violated the clearly established constitutional rights of Plaintiffs as alleged more fully below.  Plaintiffs do not currently know the true names and capacities of the Defendants sued herein as Does 1 through 100, inclusive, and therefore sue these Defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.  The individual Doe Defendants are sued in their individual capacities and are hereinafter referred to as the "Defendant Officers" or "Denver Police Officers" or "Denver Police."

9.      Upon information and belief, the Defendant Officers are citizens of the State of Colorado.

10.      All Defendants are responsible in some manner for the damages and injuries alleged in this Complaint.

11.      At all relevant times, the acts and omissions of the Defendant Officers were pursuant to the customs, policies, practices, procedures, supervision, and training of the City and the DPD.

## GENERAL ALLEGATIONS AND FACTUAL BACKGROUND

### *Plaintiffs' Activities and Injuries*

12.      The Plaintiffs are all individuals who attended, observed, were located nearby or associated with, and/or documented peaceful protests in Denver, Colorado, between the dates of

May 28, 2020, and July 19, 2020, in response to officer-involved killings nationwide, in particular, the then-recent killings of George Floyd on May 25, 2020, and Breonna Taylor on March 13, 2020, and other injustices by law enforcement.

13.     As alleged in greater detail below, each of the Plaintiffs was injured in some way after being targeted, shot at, gassed, and/or fired upon, either indiscriminately as part of a group or specifically, by the Defendant Officers because of their participation in, support of, observation or documentation of, and/or association with the peaceful protests and demonstrations against police misconduct and brutality.

14.     At the time the Plaintiffs were injured and/or arrested by the Defendant Officers, none of the Plaintiffs was rioting, committing any act of violence or aggression, threatening the police or others, or violating any law.   At all relevant times, the Plaintiffs were peacefully exercising their constitutional First Amendment rights to free speech, association, and/or documentation of public demonstrations.

15.     The injuries and damages caused to Plaintiffs were caused both by the individual unconstitutional actions of the uniformed officers, and by the customs, policies, practices, and lack of proper training and supervision of the City.

## GROUP A PLAINTIFFS
## (INJURED BY POLICE USE OF EXCESSIVE FORCE)

### *Plaintiff Rebecca Agwu*

16.     Rebecca Agwu is a resident of Colorado.

17.     On July 1, 2020, Rebecca Agwu, an African American woman, was in Civic Center Park to help the homeless in the park.

18.     Ms. Agwu was approached by Park Rangers and told they had orders to let those helping the homeless population "do your thing" and provided her with a business card.

19.     Later in the day, she and others with her with were again approached by three Park Rangers who told them things had changed and that they could not be in the park because it had closed.

20.     Denver Police Officers arrived shortly after this interaction, entered the park in riot gear, and began pushing peaceful protesters with their batons to break the demonstration line the peaceful protesters, including Ms. Agwu, had formed.

21.     Shortly after the line was broken by officers in riot gear, the officers fired tear gas and started pepper-spraying peaceful protesters, including Ms. Agwu.

22.     Ms. Agwu's face, eyes, mouth, and clothes were covered in pepper spray and chemicals as she ran away from the officers.

23.     The pepper spray/chemicals dripped from her head into her eyes to the point that she could not see for long periods of time.

24.     Ms. Agwu has now been having night terrors regarding the incident and is unable to sleep.

### *Plaintiff Jesse Andersen*

25.     Jesse Andersen is a resident of Colorado.

26.     On July 1, 2020, around 9:00 p.m., Mr. Andersen was in a group of peaceful protesters on the sidewalk next to Civic Center Park, when Denver Police Officers in riot gear started to physically push peaceful protesters with their batons away from the park to break the demonstration line peaceful protesters had formed.

27.     While pushing the peaceful protesters, the officers used tear gas and shot peaceful protesters, including Mr. Andersen, with pepper balls to disperse them.

28.     Mr. Andersen was injured by being hit multiple times with pepper balls and by the chemicals from tear gas and pepper spray that covered his body.

### *Plaintiff Azria Arroyo*

29.     Azria Arroyo is a resident of Colorado.

30.     On May 30, 2020, around 4:00 p.m., Ms. Arroyo participated in peaceful protests alongside several hundred other peaceful protesters in the State Capitol complex area of downtown Denver.

31.     While Denver Police Officers were in formation, several peaceful protesters asked the officers for their badge numbers and names because the officers had hidden their identifying information.

32.     The officers refused to give any identifying information, and when they grew tired of being asked, they deployed dozens of tear gas canisters to entirely remove peaceful protestors from the area, filling the entire Capitol complex with gas and smoke which could be felt and was visible to the naked eye from hundreds of yards away.

33.     During this offensive, the officers threw three tear gas canisters directly at Ms. Arroyo's feet, engulfing her with hot chemical gas.  Ms. Arroyo felt like she was drowning and could not breath.  Her skin and eyes felt "like they were on fire."

34.     As the peaceful protesters, including Ms. Arroyo, ran away, Denver Police targeted the location where people were running and deployed tear gas there as well so that peaceful protesters could not escape the toxic gasses.

35.     While many protestors, including Ms. Arroyo, stood in Civic Center Park trying to escape the fumes and catch their breath, Denver Police Officers broke formation, charged into the park, and began firing less lethal projectiles indiscriminately into the crowd.

36.     While Ms. Arroyo simply stood in the park with the other protestors, she was shot in the leg with a rubber bullet.

37.     Following this incident, Ms. Arroyo suffered painful bruising on her leg from the rubber bullet, constant nose bleeds, breathing problems, blisters in her throat from the exposure of tear gas, and inconsistent and painful menstrual cycles.

### *Plaintiff Scarlett Barnhill*

38.     Scarlett Barnhill is a resident of Colorado.

39.     On May 30, 2020, Ms. Barnhill attended a peaceful protest in downtown Denver in the wake of the death of George Floyd.

40.     While she was peacefully demonstrating, Ms. Barnhill was shot in the head with a rubber bullet by Denver Police.  She was shot with such force that her glasses were knocked off her face.

41.     On June 1, 2020, Ms. Barnhill was again peacefully protesting near Civic Center Park in Denver when she was shot again by Denver Police Officers with either pepper balls or rubber bullets in her back and in the front of her body.

42.     As a result, Ms. Barnhill developed severe bruising on her body.

43.     Ms. Barnhill has also experienced psychological injuries that include anxiety and traumatic  flashbacks,  inability  to  handle  or  interact  with  police  for  matters  involving  her

employment at a bookstore, and she has been intimidated from exercising her First Amendment Rights to free speech.

### Plaintiffs Dana Bergren and Chelsea Smith

44.     Dana Bergren is currently a resident of Montana but was a resident of Colorado at the time the subject incidents occurred.

45.     Chelsea Smith is a resident of Colorado.

46.     Ms. Bergren and Ms. Smith are friends who, on May 28, 2020, attended a peaceful protest together in downtown Denver in the wake of the death of George Floyd.

47.     They went to the State Capitol with other friends who had made signs to show their support for the movement.

48.     Ms. Bergren and Ms. Smith joined a line of peaceful protesters who had begun to march up Colfax Avenue.   Around 7:00 p.m., the Denver Police deployed tear gas in the direction of peaceful protesters.  Ms. Bergren and Ms. Smith inhaled the gas as they were trying to run away.

49.     In addition to tear gas, Denver Police also began shooting rubber bullets and pepper balls into the crowd indiscriminately.

50.     Ms. Bergen and Ms. Smith took cover in an alcove to escape rubber bullets which were bouncing all around them.

51.     Both Ms. Bergren and Ms. Smith experienced temporary blindness and burning of their eyes as a result of their exposure to tear gas

52.     As Ms. Bergen and Ms. Smith retreated to their home, which was within walking distance from the State Capitol, they continued to suffer the effects of tear gas, which was being

deployed by Denver Police throughout downtown, even in areas where there were no protesters and even using it against individuals, such as themselves, as they walked on the sidewalks to return home.

53.     Following the tear gas exposure, Ms. Smith also experienced an irregular menstrual cycle with severe cramping that lasted for at least a month afterward.

### *Plaintiff Victoria Brown*

54.     Victoria Brown is a resident of Colorado.

55.     On July 1, 2020, Ms. Brown was at Civic Center Park in Denver, Colorado, with a group of peaceful protesters who brought medical supplies to help the homeless people in the area.

56.     At around 9:00 p.m., Ms. Brown was in a group of peaceful protesters on the sidewalk next to the park when the Denver Police in riot gear began to physically push the protesters away from the park.

57.     Several protesters, including Ms. Brown, formed a line around the medic tent to preserve supplies which had been used to help injured protesters and the homeless populations near the park.

58.     Denver Police then entered the park in riot gear and began pushing and hitting protesters with their batons to break the line the protesters had formed.  The police also used tear gas and shot peaceful non-aggressive protesters with pepper-balls to disperse them.

59.     Ms. Brown was hit with pepper-balls and pepper-spray, restricting her breathing and causing her to lose sight and cough violently.  The chemicals caused Ms. Brown's skin to burn painfully.

60.     Police officers told Ms. Brown not to stand in the street, and she complied by moving back onto the public sidewalk that borders Civic Center Park.

61.     While standing on the public sidewalk and saying something to the effect that she loved the officers and that she wanted them to love others, she was suddenly thrown to the ground by a police officer as two other officers piled on top of her.  One officer applied his forearm across her throat, restricting her ability to breathe.

62.     Ms. Brown was physically injured and psychologically traumatized by this experience.  She is now too afraid to attend peaceful protests in fear of being targeted and attacked by police for her political beliefs.  She is also anxious around men because of the extreme force used by certain male Denver Police Officers against her.  Ms. Brown's First Amendment rights have been effectively chilled by the Denver Police.

### Plaintiff Porshai Campbell

63.     Porshai Campbell is a resident of Colorado.

64.     On July 19, 2020, Ms. Campbell, along with her daughter, attended the "Law Enforcement Appreciation Rally" at Civic Center Park in Denver, Colorado, as counter-protesters.

65.     A crowd of peaceful protesters, including Ms. Campbell and her daughter, were gathered and peacefully chanting at the officers.

66.     Suddenly, and without any physical provocation, a Denver Police Officer with a patch of three bars on his uniform turned around and sprayed peaceful protesters with pepper spray in a full circle motion to hit as many people as he could.  The officer's actions were caught

on camera and were clearly an act of rage against protestors who had incited him with their chants.

67.     At the same time, another officer started to shoot pepper balls indiscriminately into the crowd of peaceful protesters as they ran away from the first officer's pepper spray.

68.     As protesters began to run away, the first officer chased people with their backs towards the officer and pepper-sprayed them in the back from head-to-toe.

69.     Ms. Campbell was about thirty feet away from the officer when he chased her down and then pepper-sprayed her in the back.  Ms. Campbell posed no threat to the officer or anyone else.

70.     Ms. Campbell was covered from head to toe in pepper-spray and could not see for approximately thirty to forty-five minutes after the incident.

71.     Ms. Campbell suffered physical injuries from the incident and now suffers from anxiety and difficulty sleeping.

### *Plaintiff David Chapman*

72.     David Chapman is a resident of Colorado.

73.     In the early morning hours of June 1, 2020, at approximately 1:30 a.m., Mr. Chapman was standing alone on the sidewalk in front of his apartment building, between 1135 and 1145 Broadway, speaking with his mother on the phone.  There were no other people on the sidewalk.

74.     While Mr. Chapman was on the phone, a Denver SWAT vehicle with at least six officers hanging off the sides approached the intersection of 12th Avenue and Broadway.

75.     A moment or two later, Mr. Chapman heard two loud bangs coming from the SWAT van.  He was instantly struck in the back near his kidney by a 40MM rubber bullet munition and then fell to the ground.

76.     As Mr. Chapman fell, he dropped his phone which then hit him in the mouth knocking out one of his front teeth.

77.     After a moment or two, as Mr. Chapman began to get up and collect his belongings, the officers fired a tear gas canister near him, filling the air around him with smoke.

78.     At no time did the Denver SWAT truck or any officers stop to detain or check on Mr. Chapman.

79.     Mr. Chapman recovered the rubber bullet from the sidewalk which landed next to him after striking him in the back.

80.     Mr. Chapman lost a tooth and sustained a large, highly visible, persistent, and painful contusion on his back, associated back pain and sleeplessness, bloody urine, and constipation related to the impact of the bullet to the soft tissue regions of his lower back.

### *Plaintiffs Theresa Dougherty and David Hagan*

81.     Theresa Dougherty and David Hagan are residents of Colorado.

82.     Starting on May 28, 2020, Ms. Dougherty, and Mr. Hagan attended the peaceful protest in downtown Denver in the wake of the killing of George Floyd.

83.     At around 10:45 p.m. on May 28, 2020, Ms. Dougherty and Mr. Hagan were shot with pepper balls by Denver Police Officers who were on a SWAT vehicle.

84.     Ms. Dougherty and Mr. Hagan returned the next day, and starting around 10:30 p.m. on May 29, 2020, until approximately 12:15 a.m., they were shot with pepper balls and tear-

gassed by officers while peacefully protesting near the State Capitol. Their clothes were covered in chemicals from the tear gas.

85.     Ms. Dougherty and Mr. Hagan again attended the peaceful protest near the Capitol on May 30, 2020.

86.     At approximately 7:45 p.m., before the city curfew went into effect, Denver Police Officers set off a concussion grenade and began to fire projectiles, including pepper balls, rubber bullets, and tear-gas canisters, indiscriminately into the crowd of which Ms. Dougherty and Mr. Hagan were a part. Ms. Dougherty and Mr. Hagan were stuck with numerous projectiles fired by Denver Police.

87.     Ms. Dougherty and Mr. Hagan were injured by the pepper ball impacts and chemicals.

### *Plaintiff Forrest Elliot*

88.     Forrest Elliot is a resident of Colorado.

89.     On June 11, 2020, Mr. Elliot was participating in the peaceful protest in downtown Denver, Colorado, in the wake of the death of George Floyd.

90.     While standing in a line of protesters nearest to the police formation, Mr. Elliot and surrounding protesters were pepper-sprayed without any warning by Denver Police Officers, and Mr. Elliot was arrested and charged with failure to obey a lawful order. Mr. Elliot is currently on deferred prosecution for the charge.

91.     The officer who pepper-sprayed Mr. Elliot and the others around him violated a Federal Temporary Restraining Order that was in effect for the use of chemical agents against peaceful protesters.

92.     On July 1, 2020, Mr. Elliot was once again at Civic Center Park in Denver with a group of peaceful protesters to protest the removal of homeless people and the confiscation of their belongings.

93.     Denver Police arrived, entered the park in riot gear, and began pushing Mr. Elliot and the other protesters with their batons.

94.     While pushing the protesters, including Mr. Elliot, who were peaceful and non-violent, Denver Police deployed tear gas, sprayed protestors indiscriminately with pepper spray, and shot them with pepper-balls.

95.     Mr. Elliot was injured after being hit with multiple pepper balls and being pepper-sprayed extensively.

### *Plaintiff Fernando Garcia*

96.     Fernando Garcia is a resident of Colorado.

97.     On May 28, 2020, Mr. Garcia went to downtown Denver, Colorado, to participate in a peaceful protest against police brutality and the death of George Floyd.

98.     Mr. Garcia attended the protest with his roommate, Aaron Williams, and arrived at the protests around 6:00 p.m.

99.     Mr. Garcia was tear-gassed by Denver Police Officers.  He was also shot in the back with rubber bullets and pepper balls by the Denver Police.

100.    Mr. Garcia's roommate was also shot by Denver Police with a rubber bullet.

101.    Mr. Garcia suffered severe bruising from being shot in the back with projectiles by the Denver Police.

102.    On May 29, 2020, Mr. Garcia returned to downtown Denver to participate in peaceful protests.

103.    Around 7:00 p.m., Mr. Garcia was once again tear-gassed by Denver Police.

104.    Although the City had imposed a curfew on that date, it had not yet gone into effect at the time Mr. Garcia was tear-gassed.

105.    On May 30, 2020, Mr. Garcia returned to downtown Denver again to participate in peaceful protests.

106.    At around 6:30 p.m., Denver Police began using tear gas indiscriminately on peaceful protestors, including Mr. Garcia.

107.    Mr. Garcia was injured from being shot by projectiles and exposed to tear-gas chemicals.

### Plaintiffs Alisa Guy and Brandi Smith

108.    Alisa Guy and her mother, Brandi Smith, are residents of Colorado.

109.    On July 1, 2020, Ms. Guy and Ms. Smith were at Civic Center Park in Denver, Colorado, with a group of peaceful protesters.  They assisted at the medic tent to help injured protesters and the homeless people in that area.

110.    Around 11:00 p.m., Denver Police drove their squad car along the border of the park and used a megaphone to tell people to leave the park.

111.    Ms. Guy and Ms. Smith gathered their belongings and headed to the sidewalk adjacent to the park.

112.    Denver Police surrounded the area, and peaceful protesters then moved toward a medic tent which had been erected at the edge of the park.

113.    The peaceful protesters, including Ms. Guy and Ms. Smith, formed a line around the medic tent to preserve supplies.

114.    Denver Police then entered the park in riot gear and began pushing and hitting the protesters with their batons to break the line the protesters had formed.  The police also deployed tear gas and smoke bombs at the protesters, including Ms. Guy and Ms. Smith.

115.    In addition to being tear-gassed, Ms. Guy and Ms. Smith witnessed a Denver Police Officer use his baton to severely beat a woman who was standing directly in front of them.  Ms. Guy and Ms. Smith feared that they would also be hit by the police with their batons.

116.    The tear gas burned their eyes to such an extent that they could hardly see.  They also both experienced coughing fits from the large amounts of smoke and tear gas.

117.    As Ms. Guy and Ms. Smith tried to run away, the officers pepper-sprayed their entire bodies, including their eyes and faces.  At no time did Ms. Guy or Ms. Smith pose any threat whatsoever to police or others.

118.    Ms. Guy and Ms. Smith developed burns on their skin, and they were forced to remove clothing that was saturated with burning chemicals.

119.    For several days after the incident and despite multiple showers, Ms. Guy and Ms. Smith experienced painful burning to their skin, particularly in their face and mouth areas.

120.    Since the incidents, Ms. Guy has also had trouble sleeping and has experienced symptoms of Post-Traumatic Stress Disorder.

121.    Because of the burning to her mouth, Ms. Guy now has issues wearing a mask which is a requirement of her employment.

***Plaintiff Jared Hayes***

122.    Jared Hayes is a resident of Colorado.

123.    On May 28 and 29, 2020, Mr. Hayes went to downtown Denver, Colorado, to peacefully protest police brutality and the death of George Floyd.

124.    On both days, while he engaged in entirely peaceful protests, he, along with many other peaceful protesters in the group around him, were tear-gassed by Denver Police Officers.

125.    On May 30, 2020, Mr. Hayes returned to downtown Denver again to re-join the ongoing peaceful protests.

126.    While he was part of a larger group of protesters on that day, Mr. Hayes was again subjected to tear gas, attacked by flash-bang grenades, and shot in the thigh with a rubber bullet or other hard projectile fired by Denver Police Officers who were firing into the crowds indiscriminately.  The impact of the projectile caused severe bruising to Mr. Hayes' leg.

127.    On May 31, 2020, Mr. Hayes returned to downtown Denver to join the peaceful protests and was again subjected to tear gas along with the other protesters in the group.

128.    On July 1, 2020, Mr. Hayes attended a peaceful protest at Civic Center Park in Denver.

129.    In an attempt to clear the park, Denver Police fired tear-gas, pepper-spray, pepper-balls, and used batons indiscriminately against the group of peaceful protesters.

130.    Mr. Hayes, who was among the group of protesters, was hit with batons and pepper-sprayed at very close range by at least two officers.

131.    As a result, Mr. Hayes went to the emergency room because of burning from the pepper spray that covered his body.  Mr. Hays also suffered anxiety and symptoms of post-traumatic stress, which affected his ability to sleep and caused him to be fearful of police.

### Plaintiff Emily Heydt

132.    Emily ("Em") Heydt is a resident of Colorado.

133.    Heydt went to downtown Denver, Colorado, on May 28, 2020, to peacefully protest police brutality and the death of George Floyd.

134.    However, after witnessing and experiencing the DPD's excessive and indiscriminate attacks against peaceful protestors, including tear-gassing and shooting protesters with pepper balls and rubber bullets, Heydt left the protest area to return home by motorcycle.

135.    While leaving the area, Heydt came up behind a Denver Police SWAT truck on eastbound 14th Street near the intersection with Grant Street and made non-threatening comments to the police officers regarding their use of force against protestors.

136.    When the SWAT truck stopped at a red light, several Denver Police Officers shot Heydt with multiple pepper balls from the back of the SWAT truck.  The truck then drove away and left Heydt at the light.

137.    The officers gave no commands or warnings before shooting and made no attempt to apprehend Heydt.  The shooting was fully captured on video and can only be attributed to retaliation for the comments Heydt made.

138.    Heydt suffered severe and persistent burning of eyes, skin, and throat, and long-term thigh bruising from being shot with the pepper balls.

139.     Heydt also suffered severe emotional trauma from the incident.  Heydt is now terrified to peacefully protest due to fear of being attacked for political beliefs.  Heydt's First Amendment rights have been effectively chilled by the Denver Police Department.

***Plaintiffs Pamela Keltie and James Stacey***

140.     Pamela Keltie and James Stacey are residents of Colorado, and Ms. Keltie is the widow of a former Denver Sheriff's Deputy.

141.     On May 29, 2020, Ms. Keltie and Mr. Stacey went by car together to downtown Denver, Colorado, to peacefully protest police brutality and the death of George Floyd.

142.     Ms. Keltie was driving her car near the State Capitol building while Mr. Stacey took photographs and videos of the protests.

143.     While the couple was inside their vehicle at the intersection of Lincoln and 13th Avenue, Mr. Stacey stood up to take photos and videos from the sunroof of the vehicle.

144.     As Mr. Stacey was filming, officers shot him with pepper balls that also hit Ms. Keltie's vehicle.  Denver Police Officers shot the couple and their vehicle several other times that night with pepper balls.

145.     The car that is jointly owned by Mr. Stacey and Ms. Keltie was damaged by the projectiles shot by the Denver Police Officers.

146.     Both Mr. Stacey and Ms. Keltie were engulfed in pepper ball chemicals that infiltrated the car through the ventilation system.  Both Mr. Stacey and Ms. Keltie experienced burning in their eyes, nose, throat, and lungs.  Both Mr. Stacey and Ms. Keltie experienced difficulty breathing long after the incident.  Mr. Stacey is an asthmatic, but he rarely used his

inhaler prior to the incident.  As a result of inhaling the chemicals, he was forced to use his inhaler frequently throughout the day for a period of two months in order to breathe.

### *Plaintiffs Christopher Lo Coco and Luna Rose Lo Coco*

147.    Christopher Lo Coco and Luna Rose Lo Coco are residents of Colorado.

148.    On May 29, 2020, Christopher and Luna Rose Lo Coco were in their vehicle along with two friends, Katie and Shelby.  The group was traveling from Denver, Colorado, to the Lo Cocos' home in Louisville, Colorado.  None of them were affiliated with or participating in the ongoing protests taking place in downtown Denver that evening.

149.    At around 7:00 p.m., their car was stopped on westbound Colfax one car behind the red traffic light at the intersection of Colfax and Lincoln near the State Capitol building.

150.    While waiting for the light to change, a Denver Police Officer, in full riot gear, raised a pepper-ball gun and fired into the broadside of the vehicle, about an inch below the window.

151.    The officer gave no commands to move or get out of their vehicle, and in fact, the Lo Cocos were legally stopped at a red light as required by law.

152.    In response, the Lo Cocos and their passengers all raised their hands in fear for their physical safety.

153.    For the entire time the party waited at the light, the officer kept his pepper-ball gun aimed at their car and continued to aim at the car as it drove away.

154.    Chemicals from the pepper balls that were fired at and hit the car got inside the car, causing lung irritation and breathing problems for the Lo Cocos.

155.    Due to lung injuries sustained as a result of this experience, the Lo Cocos will only protest online and will no longer attend community events in person.

### Plaintiff Timmy Lomas

156.    Timmy Lomas is a resident of Colorado.

157.    On May 30, 2020, Mr. Lomas went to downtown Denver, Colorado, to peacefully protest police brutality and the death of George Floyd.

158.    At approximately 7:26 p.m., Mr. Lomas was filming the front line of the protests to document the activities of the protesters and police.

159.    While Mr. Lomas was filming an incident involving a man injured by a police flash-bang grenade, he was pepper-sprayed directly in the face and upper-body by a Denver Police Officer who was standing towards his right.

160.    Mr. Lomas was several feet away from the injured man, and he was not shouting or doing anything that could be construed as threatening while he was filming.  Mr. Lomas had no weapons and was not holding any objects other than his phone.

161.    Mr. Lomas suffered severe and persistent burning on his face, neck, and chest.

### Plaintiff Alexis Mendez

162.    Alexis Mendez is a resident of Colorado.

163.    On May 30, 2020, Mr. Mendez went to downtown Denver, Colorado, to peacefully protest police brutality and the death of George Floyd.

164.    Mr. Mendez was protesting at the State Capitol building and documenting the peaceful protest by filming it.

165.    While he was filming and standing several dozen yards away from the police, he was struck in the chest with a large hard projectile shot by Denver Police Officers.

166.    The projectile left severe bruising on his chest and caused excruciating pain.  The bruising lasted several weeks.

### Plaintiff Alexis Morris-Philippus

167.    Alexis Morris-Philippus is a resident of Colorado.

168.    On May 28, 2020, Ms. Morris-Philippus went to downtown Denver, Colorado, to peacefully protest police brutality and the death of George Floyd.

169.    Ms. Morris-Philippus, along with several hundred others, assembled at the State Capitol and began to peacefully march up Lincoln Street.

170.    At an intersection, several police officers in police cruisers and "gang-unit" patrol cars lined up in front of peaceful marchers.

171.    As Ms. Morris-Philippus marched with the other peaceful protesters, Denver Police Officers shoved her thirty to fifty feet backward and struck her in the neck, throat, arms, and chest.

172.    On May 29, 2020, through June 1, 2020, Ms. Morris-Philippus again attended the peaceful protests in downtown Denver.

173.    The protester groups in which Ms. Morris-Philippus was a part were subjected to tear gas by Denver Police.  While running away from the tear gas, she was also struck multiple times in the back with pepper balls fired by police.

174.    Ms. Morris-Philippus sustained bruises and lacerations to her legs and back from being struck by pepper balls.

175.     On June 1, 2020, around 12:00 a.m., Denver Police kettled a small group of peaceful protesters, which included Ms. Morris-Philippus, deployed long range acoustic devices ("LRADs") and shot tear-gas and flash-bangs at the group.   While the smoke from these projectiles filled the air, peaceful protesters, including Ms. Morris-Philippus, were shot with pepper balls indiscriminately as they ran from the chemical gasses.

176.     Ms. Morris-Philippus developed rashes on her skin from the exposure to tear gas and multiple pepper ball pellets.   She also lost sensation in her hands which lasted almost a month.

177.     On June 11, 2020, Ms. Morris-Philippus joined a peaceful protest march up and down Colfax Avenue in Denver.   During this march, Denver Police Officers indiscriminately sprayed the protestors with pepper spray, including Ms. Morris-Philippus.   She experienced severe burning from the chemicals in the spray.

### Plaintiff Carter Nadolsky

178.     Carter Nadolsky is a resident of Colorado.

179.     Mr. Nadolsky attended the peaceful protest in downtown Denver, Colorado, on the evening of May 30, 2020, at approximately 6:00 p.m.

180.     At the time, Mr. Nadolsky was using crutches because of a recent surgery on his meniscus.

181.     As Mr. Nadolsky was standing with his crutches and observing the scene, a Denver Police Officer suddenly, and without warning, shot him in the stomach with a projectile believed to be a rubber bullet which knocked him to the ground.

182.     Denver Police then shot Mr. Nadolsky with pepper balls multiple times while he was on the ground, as he was being helped up by other protesters, and even while he tried to retreat on his crutches.  Mr. Nadolsky was covered with white powder from the pepper balls.

183.     Another officer sprayed Mr. Nadolsky again with pepper spray and without any warning while he sat trying to catch his breath.

184.     The pain from being shot in the abdomen prevented Mr. Nadolsky from sitting up the next day, and the injuries he sustained at the protest made the physical therapy and recovery for his meniscus surgery more difficult.

### Plaintiff Branden Rich

185.     Branden Rich is a resident of Colorado.

186.     On June 2, 2020, Mr. Rich went to downtown Denver, Colorado, to peacefully protest police brutality and the death of George Floyd.

187.     Around 12:30 a.m., while in a group of peaceful protesters, Mr. Rich was shot in the thigh with pepper balls by Denver Police Officers.

188.     Mr. Rich had a ping pong ball-sized welt on his thigh which bruised and caused pain for several days.

189.     Mr. Rich was also hit by a tear-gas canister in the right gluteus-maximus which also caused a painful bruise that lasted for a week.

### Plaintiff Ellektra Rowland

190.     Ellektra Rowland is a resident of Colorado.

191.     On May 29, 2020, Ms. Rowland went to downtown Denver, Colorado, to peacefully protest police brutality and the death of George Floyd.

192.	Around 9:30 p.m., while searching for her friends around the State Capitol building, Denver Police shot Ms. Rowland in the leg with a tear-gas canister which ripped open her jeans and cut her skin, causing pain and bleeding.

193.	Denver Police also shot Ms. Rowland in the head with a pepper-ball projectile which knocked her hat off and injured her head.

194.	Ms. Rowland experienced difficulty breathing and burning to her eyes because of the tear gas and pepper spray fired at her at close range.

195.	Ms. Rowland's skin burned for weeks after the incident.  Her leg wound took over a month to heal with persistent bruising.

196.	Ms. Rowland now has a hard time sleeping and experiences anxiety because of this incident.

### Plaintiff Elizabeth Werren

197.	Elizabeth Werren is a resident of Colorado.

198.	On May 29, 2020, Ms. Werren was peacefully protesting with others in downtown Denver, Colorado, in the wake of the death of George Floyd.

199.	Ms. Werren, along with other peaceful protesters, were exercising their First Amendment rights by marching and chanting "hands up; don't shoot."

200.	At about 3:45 p.m., Ms. Werren and other marchers reached the corner of Broadway and 17th Street when Denver Police Officers arrived and began pushing her and other marchers and ordering them back to the sidewalk.

201.     As Ms. Werren tried to make her way to the nearest sidewalk, an officer in front of her pulled out a canister and sprayed Ms. Werren directly in the face with a chemical spray at close range.

202.     Ms. Werren was disoriented and could not breathe or see after being sprayed with the chemicals.

203.     Once Ms. Werren recovered her sight and ability to breathe, she returned to her home in Longmont and called a nurse help-line to get medical guidance.  The nurse emphasized the importance of knowing the exact type of chemicals that were used on her.

204.     When Ms. Werren called the DPD non-emergency number to try to find out, the dispatcher refused to assist her and hung up the phone.

205.     Ms. Werren experienced coughing, shortness of breath, and burning for several days after being assaulted by the officer.

206.     Ms. Werren also experienced severe psychological trauma that stems from this incident.

## GROUP B PLAINTIFFS
## (WRONGFUL ARREST AND INJURED BY POLICE USE OF EXCESSIVE FORCE)

### *Plaintiff Benjamin Bialy*

207.     Benjamin Bialy is a resident of Colorado.

208.     On May 30, 2020, Mr. Bialy went to the Capitol Hill neighborhood in Denver, Colorado, to observe and film the protests in the wake of the death of George Floyd.

209.     While on 15th and Grant, near the State Capitol building, Mr. Bialy began filming a small number of peaceful protesters and nearby Denver Police Officers in riot gear.  While he

was filming, the officers started indiscriminately shooting rubber-bullets into the crowd along with tear gas and flash-bang grenades.

210.    A few minutes later, Mr. Bialy moved to the area of Logan and Colfax to film another group of protesters and police.  While he was filming, he had to dodge tear gas canisters, rubber bullets, and flash-bang grenades fired by Denver Police, including several flash-bang grenades that were fired directly at him.

211.    As Mr. Bialy walked down Colfax, he ducked between two parked cars to avoid being hit with rubber-bullets that were being fired from a Denver Police SWAT truck.

212.    Almost immediately after crouching down between the cars, three Denver Police Officers surrounded Mr. Bialy and without giving any commands or other information, they handcuffed and arrested him for violating curfew and failure to obey a lawful order.

213.    Mr. Bialy had bruises on his wrists from the handcuffs, and he sustained a cut on his forearm from being pushed to the ground by the police officers during the arrest.

214.    Mr. Bialy was held for three days in the Denver County Jail before being released on a personal recognizance bond.

215.    The charges were unconditionally dismissed by the City Attorney of Denver.

### Plaintiff Asa Briggs

216.    Asa Briggs is or was a resident of Minnesota during the relevant time period.

217.    Mr. Briggs came to Denver, Colorado, on May 29, 2020, for work, and his employer had provided him with a Local Regulatory and Governmental Authorities letter.

218.    Mr. Briggs was staying in a hotel located in or near downtown Denver, and he was scheduled to depart the following day on May 31, 2020.

219.    At around 11:00 p.m. on May 30, 2020, Mr. Briggs left his hotel room to try to find a place to purchase food.

220.    When Mr. Briggs arrived at the intersection of Colfax and Logan Street, there were protesters on one side of the intersection and a large number of Denver Police Officers on the opposite side.

221.    A little before midnight, the police began firing projectiles and tear gas into the crowd indiscriminately, and Mr. Briggs, who was not protesting and only observing, was tackled by Denver Police Officers and pinned to the ground.

222.    During the arrest, the officers had their knees in Mr. Briggs' back while they searched his phone and his backpack, which contained the paperwork that qualified him as an essential employee.

223.    The officers did not take the paperwork into consideration, and instead arrested him on charges of violating curfew and failure to obey a lawful order.

224.    Mr. Briggs was held at the Denver County jail until the afternoon of Monday, June 1, 2020, after paying a $500 bond.

225.    The Denver City Attorney ultimately unconditionally dismissed the charges against Mr. Briggs, but he had to return to Denver in July 2020 to collect the bond once his charges were dropped.  This created additional financial damages for flights, hotels, and rental cars.

226.    Mr. Briggs suffered physical bruising and was psychologically traumatized by his experiences and treatment by the Denver Police.

*Plaintiff John Cameron*

227.     John Cameron is a resident of Colorado.

228.     On May 29, 2020, Mr. Cameron attended a peaceful protest at the State Capitol in downtown Denver, Colorado, in the wake of the death of George Floyd.

229.     Mr. Cameron attended the demonstrations to record footage of the event as a member of the press for documentation purposes.

230.     Mr. Cameron was standing on the front steps of the Capitol, and without any warning or prior commands, Denver Police fired pepper balls and rubber bullets at him.  While running away, Mr. Cameron was hit in the back with these projectiles.

231.     Mr. Cameron was temporarily incapacitated by a coughing fit caused by inhaling chemicals from the pepper balls.

232.     On May 30, 2020, Mr. Cameron returned to the Capitol grounds in Denver to document the protest.

233.     While at the Capitol, Mr. Cameron and other protesters were pushed from the Capitol grounds onto Broadway.

234.     Again, without warning or any prior commands, Denver Police shot at the protesters, including Mr. Cameron, with pepper balls and tear gas.

235.     On June 3, 2020, Mr. Cameron returned to downtown Denver again to document the protests.

236.     Without warning or prior commands, Mr. Cameron was surrounded by Denver Police Officers, tackled, arrested, detained, and charged for violating curfew.

237.    Mr. Cameron's charges were later unconditionally dismissed by the City Attorney of Denver.

### *Plaintiff Dan Delany*

238.    Dan Delany is a resident of Colorado.

239.    On May 30, 2020, Mr. Delany and a friend traveled to downtown Denver, Colorado, to participate in a peaceful protest in the wake of the death of George Floyd.  Mr. Delany and his friend arrived around 3:30 p.m.

240.    Over time, peaceful protesters, including Mr. Delany, made their way to the Denver Police Station where they reformed a demonstration line and began chanting, "march with us," "no justice, no peace," and other common, non-threatening chants.

241.    Around 9:45 p.m., a line of police officers in tactical gear began walking up the street toward the protesters, and they started firing pepper balls, rubber bullets and tear gas canisters indiscriminately into the crowd of peaceful protesters.

242.    While Mr. Delany was running away with his back toward officers, he was shot in the back of the head with a rubber bullet, knocked to the ground, and rendered momentarily unconscious.

243.    When he regained consciousness, he experienced extreme ringing in his ears and could not hear for several minutes.  He also noticed that the back of his head was bleeding from the wound caused by the rubber bullet.

244.    Mr. Delany and his friend decided to leave the protests, and while walking away from the protests to hire a Lyft, Denver Police Officers jumped from a SWAT truck and arrested Mr. Delany and his friend for curfew violation.

245.    Mr. Delany was placed into an overcrowded holding cell at the Denver County jail, where he was forced to strip naked and held for approximately 72 hours before being released on bond.

246.    Mr. Delany's charges were unconditionally dismissed soon after he was released.

### Plaintiff Ailyn Havens

247.    Ailyn Havens is a resident of Colorado.

248.    On May 30, 2020, at around 11:00 p.m., Ms. Havens was walking with a friend on 14th Avenue near Logan Street to go to her home.

249.    Without warning or any commands, Ms. Havens was tackled by multiple Denver Police Officers, restrained, and arrested.

250.    While Ms. Havens was restrained and sitting in public awaiting transport to jail, she asked the arresting officers to lower her shirt, which had become raised above her undergarments during the arrest.  Despite her request, she was forced to remain exposed in public until a female officer finally covered her.

251.    Ms. Havens was charged with a curfew violation and failure to obey a lawful order.

252.    Ms. Havens was taken to Denver County Jail and detained for about eighteen hours until she was released on a personal recognizance bond.

253.    The charges against Ms. Havens were unconditionally dismissed by the Denver City Attorney.

### Plaintiff Lily Knowles

254.    Lily Knowles is a resident of Colorado.

255.   On May 29, 2020, Ms. Knowles went to Denver to peacefully protest police brutality and the death of George Floyd.

256.   While peacefully marching on Pearl Street toward Colfax Avenue in Denver, Ms. Knowles was tear-gassed three separate times by Denver Police.

257.   Ms. Knowles later joined the peaceful protests at the State Capitol lawn where she was tear-gassed again and also hit with pepper balls by Denver Police.

258.   While still on the Capitol lawn, Ms. Knowles stopped to help a person who had broken her ankle.  As Denver Police advanced to the lawn, Ms. Knowles was shot with tear gas yet again.

259.   On May 31, 2020, Ms. Knowles returned to Denver where she joined a group of peaceful protesters marching down Colfax Avenue.

260.   After Denver Police dispersed the group of marchers, Ms. Knowles sought refuge in an alley where she became surrounded by officers who shot her repeatedly with rubber bullets despite the fact that she was crouched in a protective position and not threatening the officers.

261.   Ms. Knowles was then tackled by officers, restrained, and arrested.  She was charged with violation of curfew and failure to obey a lawful order.

262.   While transporting Ms. Knowles and other protestors to jail, the officers turned on the heat in the transport vehicle for the sole purpose of compounding and aggravating the adverse effects of the chemicals that covered their bodies.  The officers refused to turn off the heat.

263.   Ms. Knowles was detained at the jail for over fifty hours and was not released until 9:30 p.m. on June 2, 2020.

264.     Ms. Knowles' charges were unconditionally dismissed by the Denver City Attorney.

### Plaintiff K.M.
### (Minor Child, by and through her Parents, Bradley and Desiree Mashino)

265.     K.M. is a minor child who is a resident of Colorado.

266.     On June 27, 2020, K.M. went to downtown Denver with her father to peacefully protest police brutality and the death of George Floyd.

267.     While walking to the car with her father near the State Capitol, K.M. and her father were surrounded by Denver Police Officers who separated her from her father and then detained, searched, restrained, and arrested her.

268.     K.M. was transported to the District 6 Denver Police Station and placed into a small room while she remained handcuffed.

269.     A male officer entered the room and began questioning K.M. about potentially incriminating conduct without the presence of her father or other parent and without advising her of her *Miranda* rights.

270.     After telling K.M. that she was being charged with criminal mischief, vandalism, and arson and would be processed through the Juvenile Detention Center, the officer continued to question her to try to extract incriminating evidence.

271.     At no point did this or any other officer advise K.M. of her *Miranda* rights nor did she have a parent present while she was restrained and questioned.

272.     Eventually, a female officer asked the male officer to take K.M. outside of the questioning room, and K.M.'s handcuffs were removed.  Shortly thereafter, she was released to her sister without any charges.

273.    K.M. now has anxiety about protesting again and exercising her constitutionally protected rights.

### Plaintiff Ryan Jon Pflanzer

274.    Ryan Jon Pflanzer is a resident of Colorado.

275.    On May 31, 2020, about 8:30 p.m., Mr. Pflanzer left his job as a manager of a restaurant in downtown Denver to walk home.  Because Mr. Pflanzer's usual route down 17th Street was blocked by police and a SWAT truck, he was instructed to take an alternate route which took him on the south side of Colfax Avenue.

276.    As Mr. Pflanzer tried to make his way home, he encountered a line of Denver Police Officers moving west and firing tear gas and other projectiles along Colfax Avenue.

277.    Mr. Pflanzer stood by a light pole in a grocery store parking lot near the intersection of Pearl Street and Colfax to wait for them to pass.

278.    While Mr. Pflanzer waited for the officers to pass and for the tear gas to clear, several Denver Police Officers in riot gear fired their weapons at him and ordered him to the ground.

279.    Mr. Pflanzer complied as several officers piled on top of him with their knees and feet on his back.

280.    Mr. Pflanzer had a work order stating that he was an essential employee and exempt from the recent curfew order.

281.    Mr. Pflanzer informed the officers that he was going home from work, that he was an essential employee, and that he had the proper documentation and therefore was not violating the curfew.  The officers acknowledged that they heard him, but they arrested him anyway.

282.    After he was arrested, the officers charged Mr. Pflanzer with a curfew violation and failure to obey a lawful order.

283.    Mr. Pflanzer was incarcerated for two days and was not allowed to make a telephone call for bond during that time.

284.    Mr. Pflanzer's charges were unconditionally dismissed by the Denver City Attorney.

### *Plaintiff David Seaver*

285.    David Seaver is a resident of Colorado.

286.    On June 2, 2020, Mr. Seaver attended the peaceful protest in downtown Denver, Colorado, in the wake of the death of George Floyd.

287.    Around 12:00 a.m., Denver Police Officers in riot gear approached a group of peaceful protesters that included Mr. Seaver, as they marched up Colfax from Civic Center Park and started shooting tear-gas and pepper-balls indiscriminately into the group of peaceful protesters.

288.    As Mr. Seaver was backing up with his hands in the air, Denver Police shot him with rubber bullets and pepper balls.

289.    Mr. Seaver retreated by crossing the street as officers yelled, "go home!"

290.    Mr. Seaver responded that he was trying to go home but hindered by the officers who were shooting at him.

291.    A group of officers then ran toward Mr. Seaver as one of them yelled, "get him."

292.    Mr. Seaver dropped to his knees and was not trying to flee when three officers tackled him, cut his backpack from his back, and restrained and detained him.  These officers then took selfies standing in front of Mr. Seaver using their personal smartphone cameras.

293.    Mr. Seaver was arrested, detained, and charged with curfew violation and failure to obey a lawful order.  Mr. Seaver missed a day of work while detained.

294.    Mr. Seaver's charges were unconditionally dismissed by the Denver City Attorney's Office.

### Plaintiffs Sable Spottswood and Jonathan Ziegler

295.    Sable Spottswood and Jonathan Ziegler are residents of Colorado.

296.    On May 31, 2020, Ms. Spottswood and Mr. Ziegler went together to downtown Denver, Colorado, to peacefully protest police brutality and the death of George Floyd.

297.    They were peacefully protesting near the State Capitol building and had joined a group that was marching down Colfax Avenue.

298.    Mr. Ziegler was wearing a bright red cross to indicate that he was a street medic who could help provide medical attention to injured persons.

299.    However, Ms. Spottswood and Mr. Ziegler became concerned when they saw Denver Police Officers in riot gear on the running boards of police trucks going up and down Colfax Avenue and indiscriminately shooting projectiles into crowds of people.  They even witnessed a man near them get struck in the eye with a projectile fired by the Denver Police.

300.    They tried to leave the protests to return home when they and other protesters found themselves surrounded by Denver Police Officers in an alley.

301. They complied and submitted to the officers' commands. Nevertheless, the officers shot at them with various projectiles.

302. Ms. Spottswood and Mr. Ziegler were both arrested, detained, and charged with curfew violation.

303. Mr. Ziegler was held at the Denver County jail until approximately 9:00 p.m. on June 3, 2020.

304. The charges against both of them were unconditionally dismissed by the Denver City Attorney.

305. Ms. Spottswood and Mr. Ziegler suffered bruising and injuries to their legs and hands from being shot by projectiles. They have both experienced panic attacks which began immediately after the incident.

306. While Ms. Spottswood and Mr. Ziegler believe that peaceful protests and demonstrations are vital to democracy, they are both fearful of participating in peaceful protests because they do not want to be targeted and assaulted by the police for their political beliefs. Their First Amendment rights have effectively been chilled by the City of Denver and the actions of its police officers.

*Plaintiff James Sweetman*

307. James Sweetman is a resident of Colorado.

308. On May 30, 2020, Mr. Sweetman and a friend were riding bicycles in downtown Denver, Colorado, when they heard sounds of the protests concerning the death of George Floyd.

309. For Mr. Sweetman and his friend to get back to his friend's home, they had to cross Colfax Avenue.

310.    As they made their way to Colfax, Mr. Sweetman stopped to take photographs and/or videos of Denver Police Officers in riot gear firing tear gas, pepper balls, and rubber bullets into the crowd of protesters.

311.    When Mr. Sweetman stopped, he was surrounded by officers who charged and fired pepper balls at him, striking him in the head and back and causing him to become disoriented.

312.    Once he was no longer surrounded, Mr. Sweetman took cover behind a building where he discovered a young woman, covered in pepper spray, crying.

313.    After assisting the young woman, Mr. Sweetman returned to find his friend and was surrounded again by Denver Police Officers.

314.    Mr. Sweetman put his hands in the air and was immediately arrested and taken to jail.  Mr. Sweetman was held from Saturday night until the following Monday morning when he was released.

315.    Mr. Sweetman was charged with violation of curfew and failure to obey a lawful order, but those charges were unconditionally dismissed by the Denver City Attorney's Office.

### Plaintiff Nicholas Titus

316.    Nicholas Titus is a resident of Colorado.

317.    On June 13, 2020, Mr. Titus was in downtown Denver, Colorado, participating in a peaceful protest in the wake of the murder of George Floyd.

318.    Mr. Titus was at Civic Center Park and lawfully in a crosswalk with a walk signal, when a DPD squad car driven by Officer Hunter struck him and continued driving away.

319.   Mr. Titus had his hands raised in the air when Officer Hunter approached the crosswalk and then proceeded to hit Mr. Titus with his squad car pushing him several feet.

320.   Officer Hunter was not on a service call at the time.  Officer Hunter was simply trying to get through the crosswalk to join other officers who were observing the protest.

321.   Officer Hunter drove away without stopping, questioning, warning, detaining, or otherwise arresting Mr. Titus at that time.

322.   Several hours later as Mr. Titus and others were leaving the protests peacefully and without violating any law, Denver Police Officers approached and tackled him near the intersection of Colfax and Sherman.

323.   The officers arrested and detained Mr. Titus based upon a false complaint and information by Officer Hunter and charged him with obstruction of passage, ostensibly for blocking Officer Hunter's squad car hours earlier in the crosswalk where Officer Hunter purposefully ran into him with the car and drove away.

324.   Despite the lack of evidence to proceed on the charges, the Denver City Attorney prosecuted the case against Mr. Titus for over eleven months.

325.   At the day of trial, the Denver City Attorney unconditionally dismissed the case against Mr. Titus.

### *Plaintiff Gregory Trickel*

326.   Gregory Trickel is a resident of Colorado.

327.   On May 29, 2020, Mr. Trickel attended the peaceful protests in Denver, Colorado.

328.     Mr. Trickel peacefully participated in the protests on Lincoln Street until the protesters, including Mr. Trickel, were dispersed by Denver Police firing flash-bang grenades and pepper-spray into the crowd.

329.     At that point, Mr. Trickel headed east to Sherman Street with his hands in the air to indicate compliance.

330.     Nevertheless, Denver Police Officers targeted Mr. Trickel and pointed lasers from their rubber bullet guns at Mr. Trickel's face and genital area.  One officer fired a rubber bullet at Mr. Trickel's face from about 15 feet away.  Luckily the bullet missed him.

331.     As Mr. Trickel and other protesters dispersed, Denver Police Officer Carrera began chasing him.

332.     Mr. Trickel complied with Officer Carrera's commands, but Officer Carrera tackled him anyway.

333.     Officer Carrera detained Mr. Trickel and bound his wrists with zip ties.  Mr. Trickel was held to the ground by the full weight of another officer who pushed his knee into Mr. Trickel's back.

334.     Officer Carrera and the other officers arrested Mr. Trickel, transported him to jail, and charged him with curfew violation and failure to obey a lawful order.

335.     Mr. Trickel's charges were unconditionally dismissed by the Denver City Attorney's Office.

### *Factual Allegations Relating to The City of Denver's Customs, Policies, Practices, Procedures, Supervision, and Training*

336.     The protests against police brutality that were going on in Denver during the relevant time period started on or about May 28, 2020 and continued almost daily into the middle

of June.  Additional protests and demonstrations occurred on a smaller scale into the month of July 2020.

337.    In response to the protests, the City, through its law enforcement agency, the DPD, dispatched its officers and officers from other agencies and jurisdictions into the streets of the City.  These officers were outfitted in protective riot gear and were armed with "less-lethal" munitions, including chemical sprays (tear gas and pepper spray) and hard potentially injurious projectiles, such as flash-bang grenades, pepper balls, rubber bullets, and other kinetic impact projectiles ("KIPs"), that can be loaded into a gun or "launcher," aimed, and fired with precision at any target.

338.    At or near the beginning of the protests, one Denver Police Officer posted a photograph on Instagram showing himself and two other officers dressed in riot gear with the caption, "Let's start a riot."

339.    According to media reports, this officer joined the DPD in October 2019 and would have completed the Department's 3.5-month-long field training program in January or February of 2020—just months before being assigned to the protests.

340.    Other DPD officers were found to have used inappropriate force during the protests, including Officers Diego Archuleta and Derek Streeter.  Officer Archuleta, who had been with the DPD for four (4) years as of May 2020, had only received one (1) hour of crowd control training during his time at the Academy.

341.    Both Officers Archuleta and Streeter were disciplined for failure to distinguish between individuals participating in illegal activity and those merely verbalizing or expressing discontent with police.

342.    The Denver Office of the Independent Monitor ("OIM") issued a detailed report concerning the DPD's response to the 2020 protests.

343.    The OIM report cited observations of DPD officers using less-lethal munitions in troubling ways, specifically including the following:

a.    Deploying pepper ball rounds at persons who were verbally objecting to police behavior and not engaged in apparent physical resistance;

b.    Deploying pepper ball rounds and other projectiles that nearly or directly impacted prohibited areas of the body, including the head, face, and groin; and

c.    Continuing to deploy chemical, gas, impact, or explosive munitions after their use had already caused people to disperse and leave an area.

344.    The OIM report found that there was no guidance for high-risk explosive devices, such as rubber-ball grenades and noise-flash diversionary devices ("NFDDs"), and it identified inappropriate and/or insufficient standards for the use of pepper ball projectiles or "direct-fired" pepper balls.  Specifically, the report found that the DPD has only one standard for using such pepper balls—defensive resistance—which is defined in the crowd control context as "physical actions by members of a crowd that constitute an unlawful assembly and/or disruption to pedestrian or vehicle traffic."  The report continued, "This means that an officer may strike a person directly with pepper ball in response to nothing more than disrupting traffic.  We believe that this standard is too low for direct-fired pepper ball use."

345.    In light of these findings, the OIM report made the following recommendations: that the DPD disallow the use of rubber-ball grenades during crowd control operations; that the DPD articulate clear and specific standards for when rubber-ball grenades and NFDDs may be

used; that the DPD revise its standards for pepper ball use; and that direct-fired applications of pepper balls be limited only to circumstances in which a person displays active or aggravated active aggression.

346.    The OIM report found that not all officers using projectile launchers were trained and certified in using such weapons, and it recommended that the DPD implement standards to specify and ensure that only authorized officers may use such weapons during crowd-control events.

347.    With respect to mutual aid/assistance from other jurisdictions, the OIM report found that officers from other jurisdictions had used the following types of weapons and ammunition against protesters:  (1) at least 73 rounds of rubber-ball projectiles/pellets; (2) more than 150 "less-lethal" shotgun rounds, which can be aimed and fired like traditional shotguns and which can also be mistakenly loaded with and fire lethal ammunition; and (3) more than 200 rounds of "beanbags" filled with lead shot.

348.    While there was no reported use of such weapons/ammunition by officers directly employed by the DPD, the Use of Force Policy and Crowd Management Manual of the DPD did not address their use one way or the other.

349.    The OIM report not only recommended that the DPD develop agreements, procedures, and command control structures for working with other jurisdictions, but also that the DPD require its mutual aid partners to adhere to DPD's policies and use only the weapons and ammunition approved by the DPD.

350.    The OIM report also found problems with internal tracking and logging of the use of less-lethal weapons during crowd control events;  insufficient requirements and policies

regarding the wearing and use of body cameras during such events; insufficient supervision and review of officers and corresponding use of force during crowd control operations; failure of officers and supervisors to issue dispersal orders before using force to disperse crowds; lack of sufficient enforcement regarding the prominent display of officers' badge numbers; and allowing untrained or insufficiently trained officers to use "less-lethal weapons, including pepper ball guns, and corresponding launchers, and other projectile weapons during crowd control operations

351.    A full copy of the OIM report, which was released to the public, is attached hereto and is incorporated by reference herein as Exhibit 1.

352.    The DPD's failure to train officers, implementation of inappropriate policies and its failure to implement other policies and standards as set forth in the OIM report not only resulted in injuries to the Plaintiffs, but also similar injuries to many other individuals who were participating, observing, or otherwise near the protests/demonstrations in Denver in late May through June/July of 2020.  Many of these other injured persons are parties to other federal lawsuits that have already been filed in the U.S. District Court of Colorado.

353.    Four plaintiffs filed an action against the City on June 4, 2020, *Abay v. City of Denver*, that was subsequently removed to the United States District Court for the District of Colorado, Civ. Action No. 20-cv-01616-RBJ, and included allegations that the City, through its DPD officers, used and condoned the use of excessive force tactics against peaceful protestors, members of the media, and even third-parties in the vicinity of the protesters to punish them for demonstrating against police brutality and with the intention and/or effect of discouraging their and others' First Amendment right to free speech and expression.

354.     The *Abay* action resulted in the issuance of a temporary restraining order restricting the officers "from employing chemical weapons or projectiles of any kind against persons engaging in peaceful protests or demonstrations … unless an on-scene supervisor at the rank of Captain or above specifically authorizes such use of force in response to specific acts of violence or destruction of property that the command officer has personally witnessed." *Abay v. City of Denver*, 445 F.Supp.3d 1286, 1294 (D.Colo., June 5, 2020).

355.     Around the same time, the City's Executive Director of Safety, Murphy Robinson, sent a memorandum to Chief of Police, Paul Pazen, that referred to the recent protest activities and serious injuries caused by pepper balls and sponge-tipped rounds fired by 40mm launchers.  Mr. Robinson requested that the City immediately consider prohibiting the use of 40mm launchers against any individuals in a crowd during any upcoming protests, that there be an internal review to determine whether such launchers are appropriate for crowd control, and that all DPD officers authorized to use pepper balls be reminded of their training, including that pepper balls may only be fired at the ground and not into a crowd of protesters.  A copy of this memorandum is attached hereto and incorporated by reference herein as Exhibit 2.

356.     However, the Defendant Officers continued to indiscriminately use such weapons against protesters in defiance of the Court's Order and the Director of Safety's requests, and the Defendant City continued to condone and ratify these actions through inaction for the duration of the protests, which continued through the summer.

357.     The allegations on which the restraining order was based are consistent with the attitude expressed in the now-terminated DPD officer's Instagram post and the findings of the OIM report that a policy, practice, and/or custom existed in the DPD that condoned or was

callously indifferent to the use of unnecessary and excessive force by its officers against its own citizens.

358.    In fact, just days before the federal judge issued the restraining order, the City's leaders and decision-makers, including Denver Mayor Michael Hancock and Denver Police Chief Pazen, publicly praised the DPD officers' use of force to handle the protests, which not only ratified their unconstitutional conduct, but also demonstrated the City's indifference to violations of the constitutional rights of protesters by DPD Officers.

359.    Furthermore, even if the City had written policies against the use of unnecessary and excessive force, guidelines for crowd control and dispersal, safety guidelines for using less-lethal munitions and chemicals, and/or guidance related to recognizing and respecting constitutional rights, the City's failure to adequately train its officers on these matters, as evidenced by the Instagram posting by a recently trained DPD officer, the lack of sufficient training in crowd control tactics of a 4-year veteran of the DPD (Officer Archuleta), and the findings and recommendations of the OIM report, demonstrates deliberate indifference toward the constitutional rights of persons with whom its officers come into contact.

360.    The City of Denver arrested and charged hundreds of protesters with criminal violations.  However, the City dismissed hundreds of criminal charges before the defendant protesters ever had their first appearance in Court.  This demonstrates that the City did not arrest the protesters because they had committed criminal violations, but rather as a means of quelling their protected First Amendment activities and punishing them for the same.  This enacted policy of "mass arrests" has repeatedly been held unconstitutional and is a violation of clearly established law.

361.    The policy, custom, and/or lack of training that has led to the DPD's use of unnecessary and excessive force pre-existed the incidents involving the Plaintiffs.  This policy, custom, and/or lack of training applies to the unconstitutional treatment of individuals by DPD officers, as well as unconstitutional treatment of groups of protestors.

362.    In October 2011, DPD officers used "less lethal" munitions, including tear gas and pepper balls, against protesters involved in the "Occupy" demonstrations.  At least one civilian was struck in the face.   Despite recommendations of the OIM that the DPD employ its Tactics Review Board ("TRB") to assess the tactics used during the clash with demonstrators, including compliance with existing policies and procedures, and the need for any revisions to such policies and procedures, related training, and recommendations for crowd control tactics to improve outcomes for future demonstrations, the City declined to accept those recommendations.

363.    In January 2017, the OIM again highlighted several noteworthy deficiencies in the DPD's draft Use of Force Policy, including vague and poorly defined key provisions, lack of clarity for the overall standard for when force may be used, less restrictive standards for use of force as compared to other similar large police agencies in the country, and lack of adherence to national standards, including the definition of deadly force.

364.    There are dozens of additional documented claims and lawsuits against the City and/or its police officers going back well over ten years in which the City either paid settlements or had verdicts against it based on allegations of the use of unnecessary and excessive force against individuals in non-violent situations.  Recently, Attorney David Lane compiled a list of just some of those incidents in an exhibit to a Complaint against the City of Denver captioned *Naphtali, et al. v. City and County of Denver,* Case No. 1:20-cv-02198.  Plaintiffs have attached

and incorporated by reference herein a version of Mr. Lane's exhibit, with his permission, as Exhibit 3.

365.    In addition to the unlawful mass arrests and the unlawful use of chemical and less-lethal munitions against groups of peaceful protesters, the City also implemented an unconstitutional curfew order that violated the rights of each Plaintiff.  On May 30, 2020, the Mayor of Denver declared an "emergency" and announced a curfew order for the entire city, set to begin at 8:00 p.m. that evening.  The curfew was issued while thousands of individuals peacefully marched and demonstrated in Denver.

366.    The curfew was imposed in all public places within the City and County of Denver, including streets and public rights-of-way, from 8:00 p.m. on May 30, 2020, to 5:00 a.m. on Sunday, May 31, 2020, and from 8:00 p.m. on May 31, 2020, until 5:00 a.m. on June 1, 2020.

367.    On June 1, 2020, the Mayor of Denver extended the curfew for four more days. The curfew was in effect each night from 9:00 p.m. to 5:00 a.m. on the evenings of June 1, 2, 3, and 4, 2020.

368.    During the curfew hours, "all persons" were "prohibited from using, standing, sitting, traveling or being present on any public street or in any public place, including for the purpose of travel," with certain exceptions.  However, there was no exception for constitutionally protected First Amendment activity.

369.    A violation of the curfew order was a criminal violation punishable by a fine up to $999.00 or imprisonment up to 300 days.

370.    The City's curfew was implemented by DPD officers to target peaceful protesters (or people believed to be or associated with such protesters), such as the Plaintiffs, who were doing nothing more than exercising their First Amendment rights to express themselves, redress grievances, and to support, associate with, observe and/or document others who oppose racial injustice and police misconduct and brutality.

371.    Each of the Plaintiffs was directly impacted by this curfew order, either because they were unlawfully arrested on the basis of curfew violation or because their First Amendment rights were suppressed as a direct result of being unable to protest for fear of arrest.

372.    With respect to officers from other jurisdictions, the City invited officers from the City of Aurora Police Department ("Aurora PD") to assist with the City's response to the protests.

373.    A recent internal use-of-force review of the Aurora PD has revealed an extensive lack of training in many areas of policing, specifically including the constitutional limits of use of force and de-escalation tactics.   In addition, the report revealed underlying policies and customs where the use of force is permitted under any circumstances and without first attempting to de-escalate matters.

374.    The Defendant City, as a participant of past certification review processes of the Aurora PD, knew or should have known of these deficient policies, customs, and training before it invited Aurora PD officers to join and assist officers of the DPD in responding to the protests.

375.    If the City had clear policies and guidelines about the proper handling of peaceful demonstrations, crowd control, and the protection of constitutional rights, then the DPD officers and its agents would have known that they could not target or randomly use injurious weapons

against peaceful protesters, such as Plaintiffs, who were not committing crimes or violating any laws.

### *Plaintiffs' Damages*

376.    As a direct and proximate result of the unconstitutional acts, including the use of excessive and unreasonable force against the Plaintiffs in Groups A and B by officers and agents of the DPD, the wrongful arrests of the Plaintiffs in Group B by the arresting officers named herein as well as other currently unidentified officers of the DPD, and the City's policies, practices, customs, and/or lack of supervision and training, which were the moving force and cause of the officers' misconduct, Plaintiffs have suffered injuries, damages, and losses, including without limitation physical injuries, pain and suffering, loss of enjoyment of life, humiliation, anxiety, mental and emotional distress, and fear of being shot, gassed, injured, arrested, charged, detained, and/or incarcerated for lawfully exercising their First Amendment constitutional rights to peacefully assemble, associate, express their opinions and beliefs, observe and document public events and demonstrations, and redress their grievances, particularly their opinions and beliefs about racial injustice and police brutality.

### CLAIMS FOR RELIEF

377.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

378.    The First Amendment of the United States Constitution protects the freedom of speech, association, expression, press, and the right of people to peacefully assemble and petition the government to redress grievances.

379.    The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures and the use of excessive force in connection therewith.  When restraining, detaining, and/or arresting a person, the Fourth Amendment protections only allow police officers to use the amount of force that is reasonable and necessary under the circumstances.

380.    The Fourteenth Amendment protects persons from deprivations of life (including loss of or injury to life), liberty, and property without due process of law, including substantive protections against arbitrary abuses of executive power.

381.    A municipality may be liable under 42 U.S.C. §1983 where a municipal policy or custom causes the constitutional violations, and the municipality's failure to adequately train its officers may form the basis of such municipal policy or custom.  *See City of Canton, Ohio v. Harris*, 489 U.S.  378, 388-90 (1989).

382.    The City, through its Chief of Police, Paul Pazen, and Mayor Michael Hancock, had the ultimate decision- and policy-making power for the DPD and ultimate responsibility for adopting and implementing DPD policies and imparting such policies to DPD's police officers and agents acting on its behalf through training and supervision.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. §1983 - Violation of Fourth Amendment of U.S. Constitution**
**Use of Unnecessary, Unreasonable and Excessive Force**
**(Plaintiff Groups A and B against all Defendants)**

383.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

384.    At all relevant times, the Defendants acted under color of state law, and Defendants Hunter, Carrera, and the other DPD officers (collectively referred to as the

"Defendant Officers") acted within the course and scope of their employment and/or agency as law enforcement officers for the City.

385.    Plaintiffs had protected Fourth Amendment rights against being injured and victimized by the use of unnecessary and excessive force by law enforcement officers and against being arrested without probable cause or other lawful justification.

386.    A "seizure" for purposes of the Fourth Amendment to the U.S. Constitution occurs when an officer intentionally restrains the freedom of a person to simply walk away, *Tennessee v. Garner*, 471 U.S. 1, 7 (1985), by means of physical force or a show of authority, *Fogarty v. Gallegos*, 523 F.3d 1147, 1155 (2008).  Even an unintended person is "seized" if such person is an object of the detention.  *Browar v. County of Inyo*, 489 U.S. 593, 596 (1989).

387.    Whether the force used by police officers is unreasonable and thus excessive is determined by an objective analysis of the facts and circumstances that existed at the time the force was applied, including the severity of the suspected crime, whether an immediate threat was posed to the safety of the officers and others, and whether the suspect was actively resisting or evading arrest.  *Fogarty*, 523 F.3d at 1159-60.

388.    Reasonable officers at the time of the actions alleged herein would have been on notice that using the previously alleged munitions or "any other type of pain-inflicting compliance technique" may constitute excessive force if applied under circumstances that failed to warrant such use of force.  *Fogarty*, 523 F.3d at 1161-62.

389.    The Defendant Officers violated Plaintiffs' rights to be free from excessive and unreasonable force and unreasonable seizure when they used "less-lethal" weapons, kettled, and/or arrested Plaintiffs without any lawful justification.

390.     The Defendant Officers used unreasonable and excessive force in indiscriminately using "less-lethal" weapons at or against the Plaintiffs, or alternatively, in specifically targeting certain Plaintiffs to suppress their perceived expressive activity, and not based on an individualized determination of individual conduct justifying such force, in violation of the Fourth Amendment.

391.     The Defendant Officers had no legal justification to attack and/or seize Plaintiffs in the manner and with the level of force used under the circumstances presented.

392.     The Defendant Officers engaged in these actions intentionally, willfully, and wantonly, and demonstrated deliberate indifference to and reckless disregard for Plaintiffs' constitutionally protected rights.

393.     The Defendant City has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

394.     Final policymakers for the City, including Chief Pazen and Mayor Hancock authorized the actions of the Defendant Officers and/or ratified their actions after-the-fact.

395.     The misconduct of the Defendant Officers was undertaken pursuant to the policies, practices, and customs of the City.

396.     The City's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of Plaintiffs' constitutional rights.

397.     The City and failed to properly supervise and/or train their police officers, specifically including the Defendant Officers.

398.    The need for policies, training, and supervision of officers on how to properly handle non-violent protesters and demonstrations was so obvious and lacking and so likely to result in the violation of constitutional rights, that the Defendant City and its policymakers, including Chief Pazen and Mayor Hancock were deliberately indifferent to the need.

399.    Chief Pazen and Mayor Hancock publicly condoned and ratified the Defendant Officers' conduct violating Plaintiffs' Fourth Amendment Rights.

400.    Furthermore, the City invited outside law enforcement agencies into the city to interact with protesters and authorized the use of force against them, making these outside law enforcement agencies and officers agents of the City.  However, the City did not take adequate measures to ensure that these agents would use force within constitutional limits, or even according to the City's own insufficient policies and training.  By authorizing such unconstrained use of force by outside law enforcement, the City demonstrated deliberate indifference to the constitutional rights of the protesters.

401.    As a direct and proximate result of the Defendants' unconstitutional acts and omissions, Plaintiffs' constitutional rights were violated, and they suffered injuries, damages, and losses as previously alleged above.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. §1983 - Violation of Fourteenth Amendment of U.S. Constitution**
**Violation of Rights of Due Process and Equal Protection**
**(Groups A and B Plaintiffs against all Defendants)**

402.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

403.    At all relevant times, the Defendants acted under color of state law, and Defendants Hunter, Carrera, and the other DPD officers (collectively referred to as the

"Defendant Officers") acted within the course and scope of their employment and/or agency as law enforcement officers for the City.

404.    The Defendant Officers, including Defendants Hunter and Carrera, violated the Plaintiffs' rights to due process and equal protection under the Fourteenth Amendment by indiscriminately attacking them with gas/chemical and other less-lethal weapons, or by specifically targeting and attacking certain Plaintiffs and/or arresting them for violating the curfew, peacefully protesting, or otherwise lawfully exercising their First Amendment rights.

405.    The Defendant Officers' conduct was deliberately indifferent to the Plaintiffs' rights, shocks the conscience, and violated the decency of civilized conduct under the Fourteenth Amendment.

406.    As previously alleged, the Defendant Officers' misconduct was undertaken pursuant to the policies, practices, and customs of, and/or the lack of sufficient policies, training and supervision by the Defendant City and its policymakers, which were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of the Plaintiffs' rights.

407.    In particular, the City issued a curfew order that was unconstitutionally applied to protesters (actual or perceived) such as the Group B Plaintiffs.   While the curfew made exceptions for persons engaged in certain lawful conduct, it did not do so for persons lawfully engaged in activities protected by the First Amendment.

408.    This curfew order prompted the Defendant Officers to target and arrest persons, such as the Group B Plaintiffs, for doing nothing other than participating in activities protected

by the First Amendment while not arresting persons who violated the curfew but were not protesting.

409.   As previously alleged, the Defendant Officers even arrested certain Group B Plaintiffs who were perceived to be protesters (or otherwise associated with them) despite the fact that those Plaintiffs were among those exempt from the curfew order.

410.   As previously alleged, the Defendant City's policies, practices, customs, and/or lack of sufficient policies, training, and supervision by its policymakers demonstrate the City's deliberate indifference toward the rights of Plaintiffs and others like them.

411.   Chief Pazen and Mayor Hancock publicly condoned and ratified the Defendant Officers' conduct violating Plaintiffs' Fourteenth Amendment Rights.

412.   Furthermore, the City invited outside law enforcement agencies into the city to interact with protesters and authorized the use of force against them, making these outside law enforcement agencies and officers agents of the City.  However, the City did not take adequate measures to ensure that these agents would use force within constitutional limits, or even according to the City's own insufficient policies and training.  By authorizing such unconstrained use of force by outside law enforcement, the City demonstrated deliberate indifference to the constitutional rights of the protesters.

413.   As a direct and proximate result of the Defendants' unconstitutional acts and omissions, Plaintiffs' constitutional rights were violated, and they suffered injuries, damages, and losses as previously alleged above.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. §1983 - Violation of the First Amendment of the U.S. Constitution**
**Infringement of Free Speech, Assembly, Association and/or Press**
**(Groups A and B Plaintiffs against all Defendants)**

414.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

415.    At all relevant times, the Defendants acted under color of state law, and Defendants Hunter, Carrera, and the other DPD officers (collectively referred to as the "Defendant Officers") acted within the course and scope of their employment and/or agency as law enforcement officers for the City.

416.    Plaintiffs had protected First Amendment rights to express their viewpoints and support by attending peaceful protests to redress grievances against racial injustice and police misconduct/brutality, to assemble and associate with other peaceful protesters, and/or to record and document such public protests and the public response by the police to such protests.

417.    As previously alleged, Plaintiffs were peacefully protesting or otherwise associated with the peaceful protests by observing, documenting, or being in the area where peaceful protests were occurring at the time they were attacked and/or arrested by the Defendant Officers.

418.    As previously alleged, there was no lawful reason or justification for attacking and/or arresting them.

419.    The Defendant Officers, including Defendants Hunter and Carrera, violated the Plaintiffs' First Amendment rights by targeting them as protesters or perceived protesters and attacking and/or arresting them for expressing perceived viewpoints and/or ostensibly for violating an unconstitutionally applied curfew.

420.    The Defendant Officers violated the Plaintiffs' First Amendment rights by attacking and/or arresting them to suppress, punish, or retaliate against Plaintiffs for peacefully expressing their viewpoints or otherwise for their association with and support for the peaceful protests.

421.    As previously alleged, the City had issued a curfew that provided no exceptions for activities protected by the First Amendment.

422.    Accordingly, the City adopted an official policy of targeting and arresting only protesters during the curfew hours and not non-protesters.  This was intended to further suppress Plaintiffs' protected First Amendment activities, including the right to free speech, expression, and assembly, and it violated the First Amendment.

423.    As previously alleged, the Defendant Officers violated Plaintiffs' First Amendment rights by attempting to "control" and break-up peaceful protests by using "less-lethal" weapons against and/or kettling the Plaintiffs without issuing warnings or dispersal orders, giving adequate time to disperse, or any lawful justification whatsoever.

424.    These actions were undertaken in order to discourage and suppress the exercise of Plaintiffs' First Amendment rights.

425.    Furthermore, the right to document information is grounded in the Free Speech and Petition Clauses of the First Amendment if the purpose of documenting the information is to use it to petition the government for redress of grievances.  The right to document information is also grounded in the Free Press Clause if the purpose is to publish and disseminate it to other people.

426.   The First Amendment right to document and disseminate information includes the right to photograph, audio- and video-record police officers performing their duties in public, as well as the right to photograph, audio- and video-record demonstrations.

427.   Police officers, such as the Defendant Officers, who are performing their public duties in public places have no reasonable expectation that their conduct is private and that it will not be recorded, documented, published, and disseminated.

428.   The Defendant Officers' actions in using "less-lethal" weapons against those Plaintiffs who were recording or documenting police officers performing their public duties in public places violated the First Amendment rights of those Plaintiffs.

429.   The Defendant Officers' actions in using "less-lethal" weapons against those Plaintiffs who were peacefully protesting or otherwise associated with peaceful protesters to control and suppress their speech violated the First Amendment rights of those Plaintiffs.

430.   As previously alleged, the Defendant Officers' misconduct was undertaken pursuant to the policies, practices, and customs of, and/or the lack of sufficient policies, training and supervision by the Defendant City and its policymakers, which were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of the Plaintiffs' rights.

431.   As previously alleged, the Defendant City's policies, practices, customs, and/or lack of sufficient policies, training, and supervision by its policymakers demonstrate the City's deliberate indifference toward the rights of Plaintiffs and others like them.

432.   Chief Pazen and Mayor Hancock publicly condoned and ratified the Defendant Officers' conduct violating Plaintiffs' First Amendment Rights.

433.    Furthermore, the City invited outside law enforcement agencies into the city to interact with protesters and authorized the use of force against them, making these outside law enforcement agencies and officers agents of the City.  However, the City did not take adequate measures to ensure that these agents would use force within constitutional limits, or even according to the City's own insufficient policies and training.  By authorizing such unconstrained use of force by outside law enforcement, the City demonstrated deliberate indifference to the constitutional rights of the protesters.

434.    As a direct and proximate result of the Defendants' unconstitutional acts and omissions, Plaintiffs' constitutional rights were violated, and they suffered injuries, damages, and losses as previously alleged above.

<u>FOURTH CLAIM FOR RELIEF</u><br><b>42 U.S.C. §1983 - Violation of Fourth Amendment of U.S. Constitution</b><br><b>Unlawful Arrest</b><br><b>(Group B Plaintiffs against all Defendants)</b>

435.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

436.    At all relevant times, the Defendants acted under color of state law, and Defendants Hunter, Carrera, and the other DPD officers (collectively referred to as the "Defendant Officers") acted within the course and scope of their employment and/or agency as law enforcement officers for the City.

437.    Each one of the "Group B Plaintiffs" was arrested by or because of the Defendant Officers, including Defendants Hunter and Carrera as specifically alleged above, and other officers who cannot be identified until the arrest records are released.  Plaintiffs have requested the records for each Plaintiff in Group B, but the City has refused to comply with its obligations

under the Colorado Open Records Act and the Colorado Criminal Justice Records Act.   The City's refusal to follow the open records law demonstrates their commitment to flouting the law with regard to these Plaintiffs and other protesters.

438.    Each of these arrests was made without probable cause that the Plaintiff had violated a law, and any criminal charges against them were either unconditionally dismissed or the subject of a not guilty verdict at trial.

439.    As previously alleged, the Defendant Officers' misconduct was undertaken pursuant to the policies, practices, and customs of, and/or the lack of sufficient policies, training and supervision by the Defendant City and its policymakers, which were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of the Plaintiffs' rights.

440.    As previously alleged, the City's policies, practices, customs, and/or lack of sufficient policies, training, and supervision by its policymakers demonstrate the City's deliberate indifference toward the rights of Plaintiffs and others like them.

441.    Chief Pazen and Mayor Hancock publicly condoned and ratified the Defendant Officers' conduct violating Plaintiffs' Fourth Amendment Rights.

442.    Furthermore, the City invited outside law enforcement agencies into the city to interact with protesters and authorized the arrests and use of force against them, making these outside law enforcement agencies and officers agents of the City.   However, the City did not take adequate measures to ensure that these agents would act within constitutional limits, or even according to the City's own insufficient policies and training.   By authorizing such unconstrained

actions by outside law enforcement, the City demonstrated deliberate indifference to the constitutional rights of the protesters.

443.   As a direct and proximate result of the Defendants' unconstitutional acts and omissions, Plaintiffs' constitutional rights were violated, and they suffered injuries, damages, and losses as previously alleged above.

## REQUEST FOR PUNITIVE DAMAGES
### (Plaintiffs Titus and Trickle against Defendants Hunter and Carrera)

444.   Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

445.   Federal courts have held that punitive damages are available in actions for constitutional violations under §1983 where a defendant's conduct is shown to be motivated by evil motive or intent, or when the conduct involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1308 (10th Cir. 2003).

446.   Defendant Hunter purposefully and intentionally targeted Plaintiff Nicolas Titus by physically hitting and pushing Plaintiff Titus with his squad car while Plaintiff Titus was lawfully crossing the street in a crosswalk and then having Plaintiff Titus tackled by officers and wrongfully arrested hours later for ostensibly blocking Officer Hunter's squad car.

447.   Defendant Carrera purposefully and intentionally targeted Plaintiff Gregory Trickle, and then chased, tackled, restrained, arrested, and jailed him despite the fact that he dispersed from the protesters and complied with Defendant Carrera's commands.

448.   The charges against both Plaintiffs Titus and Trickle were dismissed.

449.    The circumstances, as previously alleged, indicate that Defendants Hunter and Carrera targeted these Plaintiffs with the intention of physically contacting and arresting them without proper basis, or they acted with reckless or callous indifference to the federal rights of Plaintiffs Titus and Trickle that are protected under the Fourth and Fourteenth Amendments to the U.S. Constitution.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully requests that this Court enter judgment in their favor and against the Defendants, jointly and/or severally, as follows:

(a) General and compensatory damages in an amount that will fully and fairly compensate Plaintiffs for their injuries, damages, losses, and violation of their federal constitutional rights available pursuant to 42 U.S.C. §1983 and any other applicable federal law;

(b) Pre- and post-judgment interest;

(c) Reasonable attorneys' fees, expert witness fees, and the cost of this action, pursuant to 42 U.S.C. §1988 and any other applicable law; and

(d) Declaratory and injunctive relief, as appropriate;

(e) Issuance of an Order mandating appropriate equitable relief, including but not limited to:

(i)  The imposition of appropriate policy changes designed to avoid future similar misconduct by Defendants;

(ii) Imposition of appropriate disciplinary action against employees of the City;

(iii)Mandatory training designed to avoid future similar misconduct by Defendants;

(f)  Punitive damages for all claims as allowed by law in an amount to be determined at

trial;

(g)  Such other and further relief as the Court deems proper and just.

**PLAINTIFFS DEMAND TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

Dated this 15th day of December, 2021.

BEEM & ISLEY, P.C.

*s/Clifford L. Beem*
Clifford L. Beem
A. Mark Isley
Danielle C. Beem
730 17th St., Ste. 850
Denver, CO 80202
Phone: (303) 894-8100
Fax: (303) 894-8200
clbeem@beemlaw.net
amisley@beemlaw.net
dcbeem@beemlaw.net

BAUMGARTNER LAW, L.L.C.

*s/ S. Birk Baumgartner*
S. Birk Baumgartner
Adam R. Yoast
300 E. Hampden Ave., Suite 4041
Englewood, CO 80113
Phone: (720) 626-9418
Fax: (720) 634-1018
birk@baumlawco.com
adam@baumgartnerlaw.com

*Counsel for Plaintiffs*

Plaintiffs' Addresses:
c/o Baumgartner Law, LLC
300 E. Hampden Ave., Suite 4041
Englewood, CO 80113
Phone: (720) 626-9418